# EXHIBIT A

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
03/07/2024 at 06:03:15 PM
By: Damaree Franklin,
Deputy Clerk

R. Brent Wisner, Esq, (SBN: 276023)
rbwisner@wisnerbaum.com
Stephanie Sherman, Esq. (SBN: 338390)
ssherman@wisnerbaum.com
**WISNER BAUM, LLP**
11111 Santa Monica Boulevard, Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

*Attorneys for Plaintiffs*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF ALAMEDA**

| | |
|---|---|
| EFREN RAMOS, JOSHUA CROSS, and MARISOL SCHARON, on behalf of themselves, and all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>ALCHEMEE, LLC and DOES 1 to 50, Inclusive,<br><br>Defendants. | Case No. 24CV066886<br><br>**CLASS ACTION COMPLAINT**<br><br>**CONSUMER FRAUD, BREACH OF EXPRESS & IMPLIED WARRANTIES, AND UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page(s)

**INTRODUCTION** ................................................................................................ **1**

**THE PARTIES** ................................................................................................... **5**

**JURISDICTION AND VENUE** ........................................................................ **6**

**GENERAL ALLEGATIONS** ............................................................................ **7**

I.    DESPITE DEFENDANT'S AFFIRMATIONS THAT ITS PRODUCTS ARE "BACKED BY SCIENCE," IT DID NOT COMPLY WITH FDA'S TESTING REQUIREMENTS BEFORE SELLING THE PRODUCTS .......................................... 8

II.   DEFENDANT KNEW OR SHOULD HAVE KNOWN THE BPO PRODUCTS DEGRADED TO BENZENE WHEN EXPOSED NORMAL USE, HANDLING AND STORAGE CONDITIONS ......................................................................... 9

III.  DEFENDANT KNEW OR SHOULD HAVE KNOWN BENZENE WAS FOUND IN OTHER CONSUMER PRODUCTS BUT IT DID NOT TEST ITS BPO PRODUCTS ............................................................................................. 11

IV.   DEFENDANT IGNORED FDA'S BENZENE ALERT TO TEST ITS PRODUCTS ............................................................................................... 12

V.    RECENT TESTING FOUND COMMON BPO PRODUCTS, INCLUDING DEFENDANT'S, CONTAIN DANGEROUS LEVELS OF BENZENE IN EXCESS OF REGULATORY LIMITS .......................................................... 13

VI.   DEFENDANT EXPOSED PLAINTIFFS AND THE CLASS TO BENZENE, A KNOWN HUMAN CARCINOGEN, WITHOUT THEIR KNOWLEDGE ................. 18

VII.  DEFENDANT MARKETED ITSELF AS EXPERTS BUT CONCEALED FROM PLAINTIFFS AND THE CLASS THEIR FAILURE TO TEST THE BPO PRODUCTS FOR SAFETY ........................................................................ 20

VIII. DEFENDANT DID NOT WARN PLAINTIFFS AND THE CLASS THE BPO PRODUCTS WERE AT RISK OF BENZENE CONTAMINATION ........................ 21

IX.   DEFENDANT AGGRESSIVELY DIRECTLY MARKETED TO CHILDREN AND TEENAGERS ................................................................................... 22

**PUNITIVE DAMAGES ALLEGATIONS** ..................................................... **23**

**PLAINTIFF SPECIFIC ALLEGATIONS** ...................................................... **24**

**CLASS ACTION ALLEGATIONS** ................................................................. **26**

**CAUSES OF ACTION** ..................................................................................... **29**

I.    VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW Bus.
      & Prof. Code § 17200 *et seq.*.................................................... 29

II.   VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT,
      Cal. Civ. Code § 1750, *et seq.,* .................................................. 31

III.  VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ........................... 33

IV.   BREACH OF EXPRESS WARRANTY .......................................................... 35

V.    BREACH OF IMPLIED WARRANTY ......................................................... 36

VI.   UNJUST ENRICHMENT ..................................................................... 37

**PRAYER FOR RELIEFs** .............................................................................. **37**

**DEMAND FOR JURY TRIAL** ..................................................................... **38**

Plaintiffs, EFREN RAMOS, JOSHUA CROSS, and MARISOL SCHARON, on behalf of themselves, the proposed California Class defined below ("the Class"), and the public, bring this Class Action Complaint ("Class Action") against Defendant, ALCHEMEE, LLC, alleging the following upon Plaintiffs' personal knowledge, or where Plaintiffs lacks personal knowledge, upon information and belief, including the investigation of counsel.

## **INTRODUCTION**

1.      This is a consumer fraud Class Action to redress the economic harms caused by Defendant's sale of benzoyl peroxide acne treatment drug products ("BPO Products" or "Products") without warning consumers the BPO Products had unsafe levels of the potent human carcinogen benzene, and that the BPO Products were at risk of degrading further into benzene under normal use, handling, and storage conditions.

2.      The BPO Products are "drugs" used to treat acne vulgaris ("acne"), formulated with a chemical called benzoyl peroxide ("BPO"), along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars. Before being sold to the public, the Products must be made in conformity with current good manufacturing practices and must conform to quality, safety, and purity specifications. Defendant's BPO Products did not.

3.      BPO Products should not have benzene, nor degrade into benzene, except under extraordinary circumstances.[1] A drug is "adulterated" if it consists in whole or in part of any filthy, putrid, or decomposed substance, is impure, or mixed with another substance.[2]  Under the Federal Food, Drug and Cosmetic Act, it is a crime to introduce or deliver "into interstate commerce any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."[3] If benzene is found in any on-market or post-market Product, the drug is adulterated, unlawful and the drug manufacturer must contact the Food and Drug Administration ("FDA") initiate a voluntary recall.[4]

4.      Throughout this Complaint, references to federal law and FDA regulation are merely to

---

[1] Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* (2017), https://www.fda.gov/media/71737/download.

[2] 21 U.S.C. § 351(a)(2011); *see also* § 351(b)-(d) (noting that a lack of purity or mixture with another substance also renders drug adulterated).

[3] 21 U.S.C. § 331(a)(2011).

[4] Food and Drug Administration. (Dec. 22, 2022). *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs,* https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain drugs (last visited Feb. 9, 2024).

1   provide context and are not intended to raise a federal question of law. All claims alleged herein arise

2   out of violations of state law, which in no way conflict, interfere with, or impose obligations that are

3   materially different than those imposed by federal law.

4         5.     The BPO Products marketed and sold by Defendant to Plaintiffs, the California Class,

5   and the public decomposed into benzene rendering them materially different than advertised, *i.e.*, by

6   containing unsafe levels of benzene. Benzene is a known human carcinogen. Studies dating to the

7   1800s have led to a consensus within the medical and scientific communities that benzene exposure,

8   even in low amounts, increases the risk of blood cancers and other adverse effects.

9         6.     In 2023, Valisure, LLC,[5] an independent, accredited laboratory that has developed

10  analytical methods to test drugs and consumer products for public safety, tested a representative

11  sample of BPO and non-BPO products and found the BPO Products had dangerous levels of benzene,

12  many multiple times higher than allowed in any regulated drug.[6] Using industry standard gas

13  chromatography and detection by mass spectrometry ("GC-MS") instrumentation, with selected ion

14  flow tube mass spectrometry ("SIFT-MS") for detection of benzene released into the air around

15  certain BPO Products, the Products were incubated to temperatures common during consumer use,

16  handling, and storage and sampled for benzene.[7] Levels as high as 1600 parts per million (ppm) were

17  found in Defendant's Product, 2.5% Cream.[8] Unexpectedly, researchers found that benzene was

18  released into the surrounding air outside the Products' containers even when the packaging and

19  containers were closed raising concern for even more inhalation exposures—a particularly pernicious

20

21

22  _____

    [5] Valisure is an independent third-party analytical laboratory that is accredited to International Organization for Standardization ("ISO/IEC") 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238). In response to rising concerns about drug shortages, generics, and overseas manufacturing, Valisure developed and validated methods to test medications and consumer products distributed in the United States. Valisure has tested a variety of drug and consumer healthcare products for benzene including sunscreens, antiperspirants, body sprays, hand sanitizers, and dry shampoos for benzene. Valisure's testing results submitted to the FDA in its Citizen's Petitions, were widely publicized in the media leading to numerous recalls of contaminated consumer products. *See* Valisure Citizen's Petition on Benzoyl Peroxide (March 4, 2024), pp. 6-7, *see also* Valisure Detects Benzene in Sunscreen, https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-sunscreen; Bruce Y. Lee, Forbes, FDA: P&G Recalls Antiperspirant Sprays Due To Cancer Risk Of Benzene (Nov. 24, 2021), https://www.forbes.com/sites/brucelee/2021/11/24/fda-pg-recalls-antiperspirants-body-sprays-due-to-cancer-risk-of-benzene/?sh=69cf13c24f32; *see also* Sandee LaMotte, CNN, Antiperspirant recall: What the finding of a cancer-causing chemical means for you (Dec. 1, 2021), https://www.cnn.com/2021/12/01/health/deodorants-antiperspirants-recall-benzene-explainer-wellness/index.html.

23

24

25

26

27

28     [6] Valisure FDA Citizen's Petition on Benzoyl Peroxide (March 6, 2024).
       [7] *Id.*
       [8] *Id.* at 17.

2

CLASS ACTION COMPLAINT

form of exposure to benzene.[9] For the non-BPO products tested, benzene was not present, or at trace levels below 2 ppm.[10]  Valisure filed a FDA Citizen's Petition on March 5, 2024 demanding an immediate recall of all BPO Products.[11] The Petition is pending.[12]

7.    The high levels of benzene found led Valisure to conduct a stability study on a diverse market sweep of BPO Products and formulations. Valisure's results show that on-market BPO Products can form over 800 times the conditionally restricted FDA concentration limit of 2 ppm for benzene, and the evidence suggests this problem applies broadly to BPO Products currently on the market.[13] Valisure concluded that on-market BPO Products appear to be fundamentally unstable and form unacceptably high levels of benzene when handled or stored at temperatures the Products will be exposed to during expected use and handling by consumers.[14]

8.    Although the BPO Products have been found to have benzene, Defendant never listed benzene among the its Products' ingredients, or anywhere on the Products' labels, containers, advertising or on Defendant's websites. Defendant never warned anyone the Products had benzene or were at risk of benzene contamination.

9.    Defendant knew or should have known its BPO Products contain and/or degraded into benzene when exposed to expected consumer use, handling, and storage conditions. BPO is known, within the scientific community (but not among consumers) to degrade into benzene according to the mechanism below:[15]

_____

[9] *Id.* at 23.

[10] *Id.* at 15 ("76 non-BPO products had no detectable benzene or values below 0.1ppm. 6 non-BPO products contained traces of benzene below 2 ppm, which could be due to various inactive ingredients used in consumer products that have been theorized to contain trace benzene"); *see also* Valisure, LLC, https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited March 6, 2024).

[11] Valisure's Citizen Petition on Benzene in Benzoyl Peroxide Products (March 5, 2024), *available at*: https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited March 7, 2024).

[12] Valisure's Citizen's Petition was still pending as of this Class Action's filing.

[13] Valisure, LLC, (March 6, 2024), *Valisure Discovers Benzoyl Acne Treatment Products are Unstable and Form Benzene*, https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited March 6, 2024).

[14] *Id.*

[15] The disposition of benzoyl peroxide to form benzene. Benzoyl peroxide is known to thermally decompose to form two molecules of benzoyloxy radicals that can further decompose to benzoic acid or phenyl radicals with liberation of carbon dioxide. The phenyl radicals can then produce benzene.  *See* Shang-Hao Liu,  et al, *Thermal hazard evaluation of the autocatalytic reaction of benzoyl peroxide using DSC and TAM III*, THERMOCHIMICA ACTA. Volume 605, Pages 68-76, , (2015), ISSN 0040-603, https://www.sciencedirect.com/science/article/pii/S004060311500057X.

CLASS ACTION COMPLAINT

Free radical and heat

Benzoyl peroxide

Benzoic acid

Benzoic acid

Benzene

$+ CO_2$

10.     Defendant misled the Plaintiffs, the California Class, and the public by representing its BPO Products only had the ingredients listed on the labels, packaging, containers, and on its website. Defendant misled the Plaintiffs, the California Class, and the public by representing the BPO Products were safe while concealing material health and safety information known to them, *e.g.*, that the BPO Products degraded to benzene, or were contaminated with benzene. Defendant misled Plaintiff, the California Class, and the public by giving the BPO Products long expiration dates of 2-3 years, leading consumers to believe the Products were safe for use for years when Defendant knew or should have known the Products degraded into benzene much sooner and were likely already contaminated by the time the Products were first used by the consumer.

11.     Defendant's statements and omissions of material health and safety information are prohibited deceptive trade practices and false and deceptive advertising. Defendant's statements about the Products were false, misleading, unsubstantiated, untruthful, and blatantly deceptive.  Even more egregious is Defendant unreasonably placed Plaintiffs, the California Class, and the public at risk of exposure to benzene, and at increased risk of cancer, without their knowledge and consent.

12.     Because of the Defendant's misconduct and consumer deception, the Plaintiffs and the California class were economically harmed, as they bought Products they otherwise would have never bought. They were also physically harmed by being exposed to a known human carcinogen.

13.     This Class Action is necessary to redress the economic harms caused to the Plaintiffs and the California Class members who bought the Products believing them to be safe. This Class

Action is further necessary to expose Defendant's ongoing consumer fraud and to enjoin Defendant from continuing their misconduct to protect consumers and the public.

14.     Plaintiffs bring this Class Action individually, and on behalf of those similarly situated, and seek to represent a California Class of consumers who bought the Products. Plaintiffs seek damages, reasonable attorneys' fees and costs, interest, restitution, and all other equitable relief, including an injunction and disgorgement of all benefits and profits Defendant received from their misconduct.

## THE PARTIES

15.     Plaintiff Efren Ramos is a California resident, located in Alameda County, who bought Defendant's BPO Products including, but not limited to, Proactiv Renewing Cleanser from 2017 to February 2024. Plaintiff has suffered economic damages and as a result of Defendant's violations of the state laws alleged. Plaintiff would never have bought the Product had Defendant warned about the presence of benzene or that the Product could degrade into benzene.

16.     Plaintiff Joshua Cross is a California resident, located in San Francisco County, who bought Defendant's BPO Products including, but not limited to, Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution® Repairing Treatment, Proactiv Solution® Renewing Cleanser, Proactiv+ Pore Targeting Treatment, and Proactiv Emergency Blemish Relief from January 2002 to December 2023. Plaintiff has suffered economic damages and a result of Defendant's violations of the state laws alleged. Plaintiff would never have bought Defendant's BPO Products had Defendant warned about the presence of benzene or that the Products could degrade into benzene.

17.     Plaintiff Marisol Scharon is a California resident, located in Los Angeles County, who bought Defendant's BPO Products including, but not limited to, Proactiv Solution® Repairing Treatment, Proactiv Solution® Renewing Cleanser, Proactiv+ Pore Targeting Treatment, and Proactiv Emergency Blemish Relief from August 2016 to March 2021. Plaintiff has suffered economic damages and a result of Defendant's violations of the state laws alleged. Plaintiff would never have bought Defendant's BPO Products had Defendant's warned about the presence of benzene or that the Products could degrade into benzene.

18.     Defendant Alchemee LLC ("Alchemee") is a citizen of California with its principal

place of business at 120 Broadway, Suite 500, Santa Monica, California 90401. Defendant sells and distributes BPO Products under the brand name Proactiv. The Proactiv Products include, *inter alia*: (1) Proactiv+ Skin Smoothing Exfoliator, (2) Proactiv Solution® Repairing Treatment, (3) Proactiv Solution® Renewing Cleanser, (4) Proactiv+ Pore Targeting Treatment, and (5) Proactiv Emergency Blemish Relief. At all relevant times, Defendant conducted business and derived substantial revenue from its manufacturing, advertising, marketing, distributing, and selling of the BPO Products within the State of California and within Alameda County, California.

19.    Defendant and its agents promoted, marketed, and sold the BPO Products within California and in Alameda County, California. The unfair, unlawful, deceptive, and misleading advertising and labeling of the BPO Products were prepared and/or approved by Defendant and its agents and were disseminated by Defendant and its agents through labeling and advertising containing the misrepresentations alleged that were disseminated uniformly to Plaintiffs and the Class through advertising, packaging, containers, and through Defendant's websites and social media.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over this action pursuant to the California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under which this action is brought do not specify any other basis for jurisdiction.

21.    This Complaint does not involve any non-California class members or any non-Californian Defendants.

22.    Venue is proper in Alameda County, California pursuant to CCP § 395(a) because it is the county where Plaintiff Ramos's injury to personal property occurred.

23.    This Court has general personal jurisdiction over Defendant because Defendant is a citizen of California and headquartered in California. Additionally, Defendant is authorized and licensed to conduct business in California, maintains and carries on systematic and continuous contacts in California, regularly transacts business within the State of California, and regularly avails itself of the benefits of the State of California, including Alameda County, where it sells Products and engaged in misconduct that has and had a direct, substantial, reasonably foreseeable, and the intended

effect of injuring people in the State of California, and within Alameda County, California.
Additionally, the claims by Plaintiffs arise out of and relate to the Defendant's action within the State of California and in Alameda County.

**GENERAL ALLEGATIONS**

24.     Fifty million Americans suffer from acne yearly.[16] Acne is the most common skin condition in the U.S. with a prevalence among adolescents of almost 95 percent.[17] Acne can begin as early as age seven and, for some, can persist through adulthood and into ages 50s and 60s.[18]  Millions of acne sufferers seek treatment every year making it a billion-dollar industry.

25.     Proactiv is the brand name for Defendant's BPO Products, which are distributed in the U.S. by Defendant from its headquarters in Santa Monica, California. To make Defendant's BPO Products, BPO, a dry white powder, is mixed with other inactive ingredients to create topical drug creams, cleansers, scrubs, and washes for use on the face and body. BPO is formulated into these Products at concentrations up to 10%. Defendant's BPO Products include: Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution® Repairing Treatment, Proactiv Solution® Renewing Cleanser, Proactiv+ Pore Targeting Treatment, and Proactiv Emergency Blemish Relief.  None of these Products list benzene anywhere as an ingredient or contaminant.

26.     Proactiv is Defendant's "powerhouse" acne treatment brand. The Proactive BPO Products are widely marketed, available, sold, and used by children, teenagers, and adults throughout the U.S. and are abrasively marketed on social media sites like Tik Tok (and its predecessor), Instagram, and Snap Chat, which skew towards younger viewers.  Defendant consistently advertised Proactiv as "America's #1 acne routine."

27.     The acne treatment industry is a highly competitive, billion-dollar market. To gain consumer trust and interest, Defendant told the Plaintiffs, the Class, and consumers "we're on a mission to become the leading global science-backed, regimen-based skincare company guided by the

---

[16] American Association of Dermatology, https://www.aad.org/media (visited October 24, 2023).
[17] JL Burton et al., *The prevalence of acne vulgaris in adolescence*, BR J DERMATOL,(1971);85(2):119–126.
[18] *Id.*

CLASS ACTION COMPLAINT

needs of our customers as well as the latest research, products and trends."[19] Defendant said it had a "history of leveraging science to create effective and powerful wellness solutions."[20]  Defendant told Plaintiffs and the Class in 2021 it will continue to "lean into our long-standing partnerships with leading experts in the field while pushing forward to develop science-backed innovation."[21] Defendant made these statements and promises to influence the Plaintiffs and Class members purchasing decisions so they would buy Defendant's Products.

28.    Defendant consistently marketed itself and Proactiv as science based.  Defendant has a "scientific advisory board," that includes board certified dermatologists.[22] Defendant's parent company, Taro told consumers it employs hundreds of scientists globally with 16% of its employees working in research and development.[23]

## I.    DESPITE DEFENDANT'S AFFIRMATIONS THAT ITS PRODUCTS ARE "BACKED BY SCIENCE," IT DID NOT COMPLY WITH FDA'S TESTING REQUIREMENTS BEFORE SELLING THE PRODUCTS

29.    Defendant said it employed scientists, researchers, a scientific advisory board, board certified physicians, and engaged with leading experts to create "science based" Products, yet it did not adequately test the Products for safety before selling them. Defendant's Products are "drugs" regulated by the FDA.  As with any regulated drug, Defendant must follow current good manufacturing practices ("CGMPs"), have scientifically sound specifications, and must have test procedures and processes to ensure the drug's  components (active and inactive ingredients), and finished products are safe.  Both raw ingredient materials and finished batches must be tested before released to the public to confirm they meet specifications for identity, strength, quality, and purity.[24] If testing results of the raw materials or finished product do not conform with the specifications, the product cannot be sold to the public.  Defendant must also re-test any Products subject to

---

[19] PR Newswire (Nov. 30, 2021), *The Proactiv Company Announces Transition to Alchemee and Expansion of Regimen Based Skin Care Offerings,* retrieved from:  https://www.prnewswire.com/news-releases/the-proactiv-company-announces-transition-to-alchemee-and-expansion-of-regimen-based-skincare-offerings-301433893.html (last visited March 7, 2024).
[20] *Id.*
[21] *Id.*
[22] *See* Proactiv.com, *Face Forward, Science Backed,* retrieved from:  https://www.proactiv.com/ (last visited March 7, 2024).
[23] Taro Pharmaceuticals Industries, Ltd., USA (March 31, 2023) *Form 20-F*, http://www.sec.gov/edgar.shtm.
[24] 21 C.F.R. § 211.84 (1978); *see also* 21 C.F.R. § 211.160 (1978).

deterioration.[25]  Any Products not made in conformity with the CMGPs is considered "adulterated" under 501(a)(2)(B) of the Food, Drug, and Cosmetic Act.[26]  It is illegal to introduce "adulterated" drugs into the U.S. market.[27]

30.    Defendant must also do stability testing to understand the "shelf life" of the Products and to assign an expiration date. It is well known that certain chemical ingredients can degrade or change because of environmental, and storage conditions such as light, moisture, temperature, and humidity, or because of the passage of time. The stability testing should cover all expected distributor and consumer storage, handling, and use conditions and must be done using "reliable, meaningful, and specific test methods."[28] If any stability testing finds that a BPO Product is not stable under expected storage or use conditions, degrades, or create toxic byproducts, the Product cannot be sold to the public.

31.    The CGMPs and stability test requirements are there to ensure drug products are safe for public use. These are the minimum requirements. Because the drug manufacturers are largely self-regulated, the FDA must rely on drug manufacturers, the public, and concerned citizens to report unsafe drugs. The FDA cannot force a drug manufacturer to recall a contaminated drug.[29]

## II.  DEFENDANT KNEW OR SHOULD HAVE KNOWN THE BPO PRODUCTS DEGRADED TO BENZENE WHEN EXPOSED NORMAL USE, HANDLING AND STORAGE CONDITIONS

32.    Defendant knew or should have known the BPO Products degraded to benzene when exposed to heat.  Defendant knew that, because of the chemical nature of the active and inactive ingredients, including BPO, the BPO Products were not stable and would degrade when exposed to heat from normal distributor and consumer use, handling, and storage conditions.

33.    It is well known that BPO degrades to benzene when exposed to heat over time.  This

---

[25] 21 C.F.R. § 211.160(b)(1)(1978).

[26] 21 C.F.R. § 225.1 (1976). Under 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act a drug is considered "adulterated" (poorer in quality by adding another substance) if the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with CGMP; *see also* Food and Drug Administration, *Facts About the Current Good Manufacturing Practices (CGMP);* https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmp (last visited Feb. 11, 2024).

[27] See Food, Drug, and Cosmetic Act, 21 U.S.C. § 331(a)(2011).

[28] 21 CFR 211.166.

[29] Food and Drug Administration, *Facts About the Current Good Manufacturing Practices (CGMP);* https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmp (last visited Feb. 11, 2024).

process was first reported in the scientific literature as early as 1936.[30] BPO degrades into benzene
according to the mechanism below.[31]



34.    The degradation of BPO to benzene was known or should have been known to the
Defendant, who consistently marketed itself to Plaintiffs and the Class as dedicated to science, safety,
and research, and who said to employed scientists, and leading experts.

35.    Defendant further knew or should have known that specific ingredients derived from
hydrocarbons increased the risk the BPO Products would yield benzene.[32] At-risk ingredients include
carbomers, mineral spirits, and other petroleum derived substances. These ingredients are red flags for
risk of benzene contamination. The FDA published guidance in 2022 urging the industry to
reformulate drug products at risk of benzene contamination.[33]  The FDA's alert highlighted
ingredients made from hydrocarbons, including carbomers (thickening agents), urging drug
manufacturers to test products containing them for benzene contamination.[34]

36.    Defendant knew or should have known through their own research, development,
formulation, manufacturing, and testing whether its BPO Products were chemically and physically
stable. Defendant was required not only to adequately test its BPO Products for safety and stability

---

[30] H. Erlenmeyer and W. Schoenauer, *Über die thermische Zersetzung von Di-acyl-peroxyden,* HELU. CHIM. ACTA, 19, 338 (1936), https://onlinelibrary.wiley.com/doi/10.1002/hlca.19360190153 (last visited Feb. 5, 2024).

[31] Benzoyl peroxide is known to thermally decompose to form two molecules of benzoyloxy radicals that can further decompose to benzoic acid or phenyl radicals with liberation of carbon dioxide. The phenyl radicals can then produce benzene.  *See* Shang-Hao Liu et al.,, *Thermal hazard evaluation of the autocatalytic reaction of benzoyl peroxide using DSC and TAM III,* THERMOCHIMICA ACTA, Volume 605, (2015), Pages 68-76, ISSN 0040-6031, https://www.sciencedirect.com/science/article/pii/S004060311500057X (last visited Feb. 5, 2024).

[32] Food and Drug Administration. (Dec. 22, 2022). *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs.*

[33]  Food and Drug Administration. *Reformulating Drug Products That Contain Carbomers Manufactured With Benzene* (December 27, 2023), https://www.fda.gov/regulatory-information/search-fda-guidance- documents/reformulating-drug-products-contain-carbomers-manufactured-benzene.

[34] *Id; see also* December 22, 2022 FDA Alert at 1.

10

CLASS ACTION COMPLAINT

before selling them, but also to monitor their internal practices, processes, and specifications to make sure they kept pace with science and emerging methodologies.  Publicly at least, Defendant said it was doing so.  Defendant said in 2021 it was "on a mission to be the leading global science-backed, regimen-based skincare company."[35]

37.    Defendant knew or should have known the BPO Products would be handled, used, and stored by distributors, sellers, and consumers under various temperatures that affect chemical stability. Defendant knew or should have known the BPO Products would travel by commercial carriers and distributors in varying storage conditions and would be stored by consumers in handbags, backpacks, bathrooms, showers, lockers, and in vehicles during warm months where the BPO Products would be exposed to heat. Defendant knew or should have known consumers would apply the benzene contaminated BPO Products to their faces and bodies and would also use the BPO Products in heated showers as scrubs and washes. Defendant knew or should have known the BPO Products would be used and applied to the skin at normal body temperatures, and elevated temperatures following showers or baths, after physical activity, and after the BPO Products sat in warm temperatures or hot vehicles.

38.    These storage, use, and handling conditions were known or should have been known to Defendant before the BPO Products were sold to Plaintiffs and the Class. Defendant knew or should have known the BPO Products degraded to benzene under these conditions exposing consumers to benzene.  Defendant further knew or should have known that, because of the known degradation of BPO to benzene, their BPO Products were contaminated with benzene by the time they reached consumers, but they sold them to Plaintiffs and the Class anyway, without warning of the risk of exposure to benzene.

III.    **DEFENDANT KNEW OR SHOULD HAVE KNOWN BENZENE WAS FOUND IN OTHER CONSUMER PRODUCTS BUT IT DID NOT TEST ITS BPO PRODUCTS**

39.    Defendant knew or should have known benzene contamination was found in other on-

---

[35] *See* PR Newswire (Nov. 30, 2021), *The Proactiv Company Announces Transition to Alchemee and Expansion of Regimen Based Skin Care Offerings,* retrieved from: https://www.prnewswire.com/news-releases/the-proactiv-company-announces-transition-to-alchemee-and-expansion-of-regimen-based-skincare-offerings-301433893.html (last visited March 7, 2024).

1  market drug and healthcare products but did not test its BPO Products for benzene. In 2020, the FDA

2  started working with companies to identify benzene in products, which resulted in product recalls of

3  hand sanitizers, sunscreens, and deodorants.  In 2021, an independent chemical analysis by Valisure

4  of hundreds of sunscreens and after-sun care products from 69 brands found 27 percent of the batches

5  had significant levels of benzene above the FDA 2 ppm limit.[36] Johnson and Johnson's Aveeno and

6  Neutrogena sunscreen lines were among the most benzene contaminated and were recalled.[37] CVS's

7  private brand after-sun care products were also highly contaminated with benzene, but not recalled by

8  CVS.  The contamination of these consumer products was widely reported around the world. By 2021,

9  Defendant was aware of the benzene contamination issues in many drug and consumer products but

10  continued to sell its BPO Products without testing them for benzene.

11  **IV.    DEFENDANT IGNORED FDA'S BENZENE ALERT TO TEST ITS PRODUCTS**

12      40.    In 2022, the FDA issued a safety alert warning drug manufacturers of the risk of

13  benzene contamination in certain drug products and drug components. The FDA reiterated the risk

14  benzene exposure poses to public health and the drug manufacturers' obligations to test drug products

15  under the U.S. Code of Federal Regulations, Title 21:

16  >  FDA reminds manufacturers they are required to establish scientifically
17  >  sound and appropriate specifications and test procedures to assure drug
    >  components (active and inactive ingredients) and finished drug products
18  >  conform to appropriate quality specifications (21 C.F.R. 211.84, 21 C.F.R.
    >  211.160).  This includes testing of raw materials and finished batches (21
19  >  C.F.R. 211.165) prior to release to ensure they meet appropriate
20  >  specifications for identity, strength, quality, and purity.[38]

21      41.    The FDA warned drug manufacturers that any drug products or components at risk of

22  benzene contamination should be tested, and any batches with benzene above 2 ppm should not be

23  released to the public.[39]  The FDA warned that, if any drug or drug component was subject to

24  deterioration, drug manufacturers must have re-testing procedures in place to ensure continued purity

25  and stability.  The FDA recommended risk assessments to evaluate the possibility of benzene

26  [36] Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products, May 24, 2021.
27  [37] Press Release. (July 14, 2021), Johnson & Johnson Consumer Inc.  Johnson & Johnson Consumer Inc.
    *Voluntarily Rec of Specific Neutrogena and Aveeno Aerosol Sunscreen Products Due to the Presence of Benzene.*
28  [38] Federal Drug Administration. (Dec. 22, 2022). *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs,* 1.
    [39] *Id.*, 3.

contamination in the drug products or components.[40]  If any drug product in circulation was found to have benzene over 2ppm, the FDA directed that drug manufacturers contact the FDA to discuss a voluntarily recall.[41]

42.     To date, none of the Defendant's BPO Products have been recalled due to benzene contamination, and Defendant has released no data showing its BPO Products are not contaminated with benzene.

## V.     RECENT TESTING FOUND COMMON BPO PRODUCTS, INCLUDING DEFENDANT'S, CONTAIN DANGEROUS LEVELS OF BENZENE IN EXCESS OF REGULATORY LIMITS

43.     Testing by Valisure in 2023 found common acne treatment products formulated with BPO are not only contaminated with benzene but have levels dangerous to public health. Valisure is an accredited independent laboratory who has developed validated analytical methods[42] to test drugs and consumer products to address rising concerns about public safety. Valisure has tested a wide variety of drugs and products for benzene including sunscreens, antiperspirants, hand sanitizers, and dry shampoos. Their work has led to widely publicized product recalls protecting the public from dangerous and carcinogenic consumer products.[43]

44.     In 2023, Valisure tested 175 finished acne treatment products to determine whether any had benzene.  Of the 175 products tested, 99 were formulated with BPO, 58 had active ingredients

---

[40] *Id.*

[41] *Id.*, 2.

[42] Valisure's test methods largely mirror those utilized by FDA's own "Drug Quality Sampling and Testing" ("DQST") Program. Valisure FDA Citizen's Petition at 4.

[43] *See* Valisure May 24, 2021 Citizen Petition on Benzene in Sunscreen and After-sun Care Products, https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-sunscreen); Valisure's Citizen Petition on Hand Sanitizer Products Containing Benzene Contamination (filed March 24, 2021), https://www.regulations.gov/document/FDA-2021-P-0338-0001), Valisure's Citizen Petition on Benzene in Sunscreen and After-sun Care Products (filed May 24, 2021), https://www.regulations.gov/document/FDA-2021-P-0497-0001), Valisure's Citizen Petition on Benzene in Body Spray Products (filed November 3, 2021, https://www.regulations.gov/document/FDA-2021-P-1193-0001), Valisure's Citizen Petition on Benzene in Dry Shampoo Products (filed October 31, 2022),  https://www.regulations.gov/document/FDA-2022-P-2707-0001) *see also* CNET, Dry Shampoo Recall: What Is Benzene and Which Brands Are Affected https://www.cnet.com/health/personal-care/dry-shampoo-recall-what-is-benzene-and-which-brands-are-affected/ (identifying 19 types of dry shampoo have been recalled due to benzene content); Ryan Basen, Medpage Today, After Valisure Petition, Ol' Dirty Benzene Forces Another Recall (November 30, 2021), https://www.medpagetoday.com/special-reports/exclusives/95929 ("After Valisure Petition, Ol' Dirty Benzene Forces Another Recall"); Bruce Y. Lee, Forbes, FDA: P&G Recalls Antiperspirant Sprays Due To Cancer Risk Of Benzene (Nov. 24, 2021),  https://www.forbes.com/sites/brucelee/2021/11/24/fda-pg-recalls-antiperspirants-body-sprays-due-to-cancer-risk-of-benzene/?sh=69cf13c24f32; *see also* Sandee LaMotte, CNN, Antiperspirant recall: What the finding of a cancer-causing chemical means for you (Dec. 1, 2021),  https://www.cnn.com/2021/12/01/health/deodorants-antiperspirants-recall-benzene-explainer-wellness/index.html.

13

CLASS ACTION COMPLAINT

1 (either individually or in combination) of salicylic acid, sulfur, adapalene, azelaic acid, niacinamide

2 and zinc, and 18 had no drug ingredients.[44] 83 of the BPO Products were purchased over the counter

3 from major retailers and 16 were prescription products purchased from licensed wholesalers.[45] The

4 BPO Products included popular Products: Proactiv 2.5% BPO Cream, Target Up & Up 2.5% BPO

5 Cream, Equate Beauty 10% BPO Cream, Equate BPO Cleanser, Neutrogena 10% BPO Cleanser,

6 Clearasil 10% BPO Cream, CVS Health 10% BPO Face Wash, Walgreens 10% BPO Cream, La

7 Roche Posay BPO Cream, and Clean & Clear 10% BPO Lotion.

8           45.      Valisure used three incubation temperatures to evaluate the effects of common

9 distributor and consumer use, handling, and storage conditions on benzene formation.  37°C/98.6°F

10 was used for human body temperature, 50°C/122°F was used to evaluate shelf-life performance as an

11 accelerated stability testing temperature used by the pharmaceutical industry,[46] and 70°C/158°F to

12 model storage in a hot vehicle.[47] The BPO Products were incubated at 37°C for four weeks and 50°C

13 for three weeks and benzene concentration was measured at certain time intervals using GC-MS.

14 Benzene findings were plotted in real time and reported in ppm. The results below were submitted to

15 the FDA in Valisure's March 5, 2024 Citizen's Petition on Benzoyl Peroxide.[48]

16      **4A**



[44] *See* Valisure Citizen's Petition on Benzoyl Peroxide (March 5, 2024).

[45] *Id.*

[46] Ghimire, Prakash et al., *Guidelines on Stability Studies of Pharmaceutical Products and Shelf-Life Estimation.* INTERNATIONAL JOURNAL OF ADVANCES IN PHARMACY AND BIOTECHNOLOGY. (2020). 06. 15-23. 10.38111/ijapb.20200601004.

[47] Grundstein A, Meentemeyer V, Dowd J. *Maximum vehicle cabin temperatures under different meteorological conditions.* Int J Biometeorol. 2009 May;53(3):255-61. doi: 10.1007/s00484-009-0211-x. Epub 2009 Feb 21. PMID: 19234721.

[48] *See* Valisure Citizen's Petition on Benzoyl Peroxide (March 5, 2024).

CLASS ACTION COMPLAINT

**4B**



**4C**



**4D**



**4E**



**4F**

**4G**



1    **4H**



46.    Valisure found the BPO formulated products were not chemically stable and yielded benzene at levels well over 2 ppm, the maximum amount allowed in any U.S. regulated drug. Some of the benzene levels were many times higher than 2 ppm reaching as high as 1700 ppm for Proactiv's 2.5% BPO Cream and over 400 ppm for Proactiv's 5.0% BPO Cream.[49] The concentration of BPO in the Products did not influence the benzene levels *e.g.*, Target's Up & Up BPO Lotion and Proactiv's 10% BPO Cream yielded similar benzene results in the range of 600 ppm.

47.    Unexpectedly, the testing showed that benzene vapors leaked from some of the Products' packaging contaminating the surrounding air even when the packaging was closed raising concern for additional inhalation exposures.[50]

48.    Valisure concluded that all on-market BPO acne formulations seem to be fundamentally unstable and form unacceptably high levels of benzene under normal use, handling, and storage temperatures, but no such evidence was observed for acne treatment products not formulated with BPO.[51]  The finding that additional benzene leaked into the surrounding air from the Products' containers means the total consumer benzene exposure would be even more dangerous than the levels reported.

49.    Valisure filed a Citizen's Petition on Benzoyl Peroxide on March 5, 2024[52] requesting the FDA Commissioner to immediately demand a recall of all Products formulated with BPO and

---

[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] As of the date of filing this Class Action, Valisure's FDA Petition was pending.

17
CLASS ACTION COMPLAINT

1  further to require that drug manufacturers do independent chemical verification.[53]  The Petition is

2  pending.

3  ## VI.   DEFENDANT EXPOSED PLAINTIFFS AND THE CLASS TO BENZENE, A KNOWN HUMAN CARCINOGEN, WITHOUT THEIR KNOWLEDGE

4

5      50.    Although benzene has been found in the BPO Products and released into the

6  surrounding air from the packaging, Defendant did not list benzene among the Products' ingredients,

7  on the Products' label or container, or anywhere in their advertising or on their websites.  Defendant

8  did not warn that the Products had benzene, are at risk of benzene contamination, or that the Products

9  could cause consumers to be exposed to benzene even when sealed.

10     51.    Benzene is a carcinogen that has been among the most studied toxins over the last 100

11 years due to its wide use during the industrial revolution, extreme danger, and known ability to cause

12 cancer and death in humans and animals. The medical literature linking benzene to blood cancers is

13 vast dating to the 1930s.[54] Benzene is the foundation component for many chemicals used to make

14 plastics, resins, synthetic fibers, paints, dyes, detergents, drugs, and pesticides. Benzene was widely

15 used as a solvent in industrial paints, paint removers, adhesives, degreasing agents, denatured alcohol,

16 and rubber cements. Benzene use has declined due to the proliferation of worker studies and an ever-

17 growing body of evidence confirming benzene's contribution to blood cancers.

18     52.    Benzene has no known safe level of exposure.[55] Benzene causes central nervous system

19 depression and destroys bone marrow, leading to injury in the hematopoietic system.[56] The

20 International Agency for Research on Cancer ("IARC") classifies benzene as a "Group 1 Carcinogen"

21

22

[53] Valisure, LLC, (March 6, 2024), *Valisure Discovers Benzoyl Acne Treatment Products are Unstable and Form Benzene,* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited March 6, 2024).

[54] *See* Hamilton A., *Benzene (benzol) poisoning,* ARCH PATHOL, (1931):434-54, 601-37; Hunter FT, *Chronic exposure to benzene (benzol). Part 2: The clinical effects.* J. IND. HYG TOXICOL, (1939):21 (8) 331-54; Mallory TB, et al.,*Chronic exposure to benzene (benzol).Part 3:The pathological results.* J. IND. HYG TOXICOL,(1939):21 (8) 355-93; Erf LA, Rhoads CP., *The hematological effects of benzene (benzol) poisoning.* J. IND. HYG TOXICOL, (1939):21 421-35; American Petroleum Institute, *API Toxicological Review: Benzene,* NEW YORK, (1948); Infante PF, Rinsky RA, Wagoner JK, et al., *Leukemia in benzene workers,*LANCET, (1977);2 (8028): 76-78.

[55] Harrison R, Saborit, J., *WHO Guidelines for Indoor Air Quality – Selected Pollutants, (2010); see also* Smith, Martyn T. (2010). Advances in Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health., (*2010) Vol. 31:133-148.

[56] FDA Toxicological Data for Class 1 Solvents, Appendix 4, *Benzene,* https://www.fda.gov/media/71738/download.

18
CLASS ACTION COMPLAINT

that causes cancer in humans, including acute myelogenous leukemia ("AML").[57]  AML is the

signature disease for benzene exposure with rates of AML particularly high in studies of workers

exposed to benzene.[58]

53.     Benzene exposure is cumulative and additive.  There is no safe level of exposure to

benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[59]

54.     The Agency for Toxic Substances and Disease Registry's ("ATSDR") "Tox Facts" for

benzene warns that people can be exposed to benzene vapors from benzene-containing products and

that benzene harms the blood marrow, causing leukemia and anemia, and affects the immune system

leaving victims vulnerable to infection.[60]

55.     According to the FDA, benzene in small amounts over long periods of time can

decrease the formation of blood cells and long-term exposure through inhalation, oral intake, and skin

absorption may result in cancers such as leukemia and other blood disorders.[61]

56.     Benzene is a major industrial chemical made from coal and oil that is heavily regulated

by the EPA as an important environmental pollutant that negatively affects the soil, air, and

groundwater. Waste and air emissions containing benzene are considered hazardous waste. The coal,

oil, paint, and chemical industries are heavily regulated due to the emission of carcinogens including

benzene from refining and other industries processes involving benzene and benzene byproducts,

which can end up in the air, water, and food supply.

57.     Benzene is heavily regulated to protect public health and should not be in drug

products, especially ones such as acne treatment that are used daily by children and teenagers for

many years. The FDA drug guidelines specify that benzene must not be used to make drugs products

because of the unacceptable toxicity and deleterious environmental effects.[62]  The FDA allows one

---

[57] International Agency for Research on Cancer. *Benzene, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 120,* LYON, France: World Health Organization, (2018).

[58] American Cancer Association, *Benzene and Cancer Risk,* https://www.cancer.org/cancer/risk-prevention/chemicals/benzene.html (last visited October 20, 2023).

[59] Smith, Martyn T., *Annual Review of Public Health,* ADVANCES IN UNDERSTANDING BENZENE HEALTH EFFECTS AND SUSCEPTIBILITY *(*2010) Vol. 31:133-148.

[60] Agency for Toxic Substances and Disease Registry, *Benzene – Tox Facts*, CAS # 71-43-2.

[61] Federal Drug Administration. (June 9, 2022). *Frequently Asked Questions:* https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs.

[62] Food and Drug Administration, *Q3C – Tables and Lists Guidance for Industry,* https://www.fda.gov/media/71737/download (last visited September 26, 2023).

CLASS ACTION COMPLAINT

limited exception – where the use of benzene in a drug product is unavoidable to produce a drug product with a significant therapeutic advance. In that instance, benzene must be restricted to two parts per million (ppm).[63]  Defendant's BPO Products do not meet this rare exception.

58.     Benzene is heavily regulated in the workplace. The U.S. Occupational Safety and Health Administration ("OSHA") set an eight-hour exposure standard of 1 ppm.[64]  The National Institute for Occupational Safety and Health ("NIOSH") established a recommended exposure level (REL) of 0.1 ppm (15-minute ceiling limit). Subsequent exposure studies known as the "China studies" confirmed cancer at levels below 1 ppm.[65]  The benzene levels created from Defendant's BPO Products are many times higher than the levels reported in these worker studies and the acceptable limits set by regulators.

59.     Benzene can also pass from the mother's blood to a developing fetus causing the baby to be exposed to benzene.[66] Animal studies have shown low birth weights, delayed bone formation, and damage to the bone marrow of developing offspring when pregnant animals breathed benzene.[67]

60.     Plaintiffs and the Class were exposed to benzene from the BPO Products by inhalation and dermal absorption. Benzene can be absorbed into the body via inhalation, skin absorption, ingestion, and/or eye contact.[68] Plaintiffs and the Class applied the BPO Products to areas of the skin including the face, neck, chest, and back one to three times per day and used the BPO Products as washes or scrubs in heated showers.  Plaintiffs and the Class were also exposed to benzene leaked from contaminated BPO Products.

**VII.    DEFENDANT MARKETED ITSELF AS EXPERTS BUT CONCEALED FROM PLAINTIFFS AND THE CLASS THEIR FAILURE TO TEST THE BPO PRODUCTS FOR SAFETY**

61.     Defendant told Plaintiffs and the Class BPO is typically safe to use for an extended

---

[63] *Id.*

[64] OSHA. Occupational exposure to benzene:  Final rule. Fed. Reg. 1987;52-34460-578.

[65] *See* Lan Q, Zhang L et al., *Hematotoxicity in Workers Exposed to Low Levels of Benzene,* SCIENCE, (December 3, 2004); Costa-Amaral I, V. B. L., *Environmental Assessment and Evaluation of Oxidative Stress and Genotoxicity Biomarkers Related to Chronic Occupational Exposure to Benzene,* INT J ENVIRON RES PUBLIC HEALTH, (2019) Jun; 16(12): 2240.

[66] *Id.*

[67] *Id.*

[68] Centers for Disease Control and Prevention, *The National Institute for Occupational Safety and Health Pocket Guide to Chemical Hazards, Benzene Exposure Limits,*  https://www.cdc.gov/niosh/npg/npgd0049.html.

period of time."[69] Defendant's mislead the Plaintiffs and the Class because Defendant's BPO Products degrade to benzene, during normal and expected handling, use, or storage, exposing consumers to benzene, and an increased risk of cancer.

62.    Defendant told Plaintiffs and the Class it is a leader in the industry, committed to continuous innovation, and "science-based solutions."[70] Defendant promised it only used "eco-certified ingredients" and "FDA compliant ingredients" for over-the-counter use.[71]  Defendant said BPO and salicylic acid have advantages for acne treatment and complement each other.[72]  Defendant did not say that BPO degrades to benzene, and salicylic acid did not.

63.    Defendant's misrepresentations about its BPO Products and omissions of material health and safety information were misleading and deceptive. Defendant's BPO Products had the highest levels of benzene when tested in 2023 by Valisure, *i.e.,* Proactive 2.5% BPO Cream was close to 1700 ppm, many multiple times higher than legal limits.

64.    Defendant's broad claims of safety in their marketing, social media, and on websites gave Plaintiffs and the Class a false sense of safety leading them to believe the BPO Products were safe.  Defendant made these statements uniformly to Plaintiffs and the Class while shirking its responsibility to do adequate and meaningful testing before selling the Products to the public.

## VIII.  DEFENDANT DID NOT WARN PLAINTIFFS AND THE CLASS THE BPO PRODUCTS WERE AT RISK OF BENZENE CONTAMINATION

65.    Defendant represented to the Plaintiffs, the Class, and the public that each of their Products had only the ingredients listed on the label and package in advertising and on websites, but none identified benzene anywhere.

66.    Defendant told Plaintiffs and the Class BPO is a "tried and true" ingredient that has been the "gold standard for acne treatment for 50 years."[73] BPO was safe to use "for an extended

---

[69] *See* Proactive.com, Acne Treatment Ingredients [Tab], retrieved from:  https://www.proactiv.com/blog/acne-skin-care-ingredients (last visited March 7, 2024).

[70] Alchemee, *Innovation,* https://www.alchemee.com/innovation (last visited November 6, 2023).

[71] *Id.*

[72] Alchemee LLC, *Is Salicylic Acid or Benzoyl Peroxide Better?*  https://www.proactiv.com/blog/acne-skin-care-ingredients/salicylic-acid (visited October 25, 2023).

[73] Alchemee LLC, *What Is Benzoyl Peroxide?* s://www.Proactiv.Com/Blog/Acne-Skin-Care-Ingredients/Benzoyl-Peroxide (last visited October 25, 2023).

period of time."[74] None of the Proactiv BPO Products listed benzene on the label, container, or anywhere on Defendant's website or advertising.[75] Defendant assured Plaintiffs and the Class that any side effects from Proactiv were "usually mild such as drying and irritation."[76]

104.    Defendant's statements about the BPO Products' ingredients were false, deceptive, and misleading.  Defendant's statements were meant to convey to Plaintiffs, the Class, and the public the Products were safe and did not have carcinogens such as benzene. Defendant made these statements to the Plaintiffs and the Class, and omitted benzene from all advertising, labeling, and packaging when Defendant knew or should have known the statements were false, misleading, and deceptive. Reasonable consumers, relying on Defendant's statements reasonably believed the BPO Products were safe and did not have benzene.

## IX.    DEFENDANT AGGRESSIVELY DIRECTLY MARKETED TO CHILDREN AND TEENAGERS

67.    Defendant's BPO Products are widely used by children and teenagers as a standalone treatment or combined with other BPO Products. Defendant knew that adolescents are the largest users with users as young as 7-10 years old. Defendant recommended that consumers, including children, use the BPO Products one to three times a day, over many months or longer for persistent acne. Defendant knew that some consumers would use the BPO Products for many years starting in their teens. There is no cure for acne. Defendant knew that consumers with chronic acne would use their BPO Products several times a day throughout their lifetime.

68.    Defendant aggressively marketed the BPO Products directly to children and teenagers knowing, or they should have known, the BPO Products degrade to benzene under normal use and storage conditions.  Many of Defendant's online and print advertisements featured children, teenagers, eye-catching props, music, and colors meant to attract teens and pre-teens, and appeal to their preferences, activities, and interests.

69.    Defendant encouraged parents to start treating teenage acne early with benzoyl peroxide

---

[74] *Id.*
[75] *See e.g.*, Proactiv Repairing Treatment Package, 2 Fl Oz [60 Ml].
[76] Alchemee LLC, *Does Proactiv Have Any Side Effects?*  https://www.Proactiv.Com/Faqs, (last visited October 25, 2023).

drug products.[77] Defendant promised the Products were "safe and effective for teens" and "penetrate deeply into the pores to kill acne."[78]

70.    Defendant's marketing of BPO Products without mentioning benzene, the risk of benzene exposure, or testing for benzene wase and continues to be misleading, fraudulent, deceptive, and dangerous.

**PUNITIVE DAMAGES ALLEGATIONS**

71.    Defendant's conduct was done with malice and reckless disregard for human life. Defendant knew the BPO Products degraded to benzene when exposed to heat under normal consumer use, handling, and storage conditions. Defendant further knew that benzene is a known human carcinogen that is not supposed to be in the BPO Products due to the grave risk of harm to consumers.  Defendant disregarded this information and the known risks of benzene exposure and deliberately omitted benzene from the list of ingredients, the BPO Products' labels, and their social media and websites where information about the BPO Products is found. Defendant consciously and deliberately crafted the BPO Products' marketing, labels, packaging, containers, and warnings intending to mislead Plaintiffs, the Class, and the public, and lead them to believe the BPO Products were safe and carcinogen-free.

72.    Defendant marketed itself as expert drug formulators, researchers, and merchandisers skilled in developing safe and reliable products while withholding material health and safety information Defendant knew was essential to informed consumer decision making.  Defendant knew that, by their conduct, they were robbing Plaintiffs, the Class, and the public of their right to choose safe products.

73.    Defendant was on notice of benzene findings in consumer and drug products leading to widely publicized recalls. Defendant was on notice of the FDA's concerns of benzene contamination in drug and consumer products and received the FDA's 2022 directive to test Products for benzene contamination.  Defendant disregarded these notices and continued to market and sell the BPO Products without testing them for benzene.

---

[77] Proactiv, *Proactiv Blog, 5 Reasons to Treat Acne Early,* https://www.proactiv.com /blog/treating-face-acne/reasons-to-treat-bad-teenage-acne-early (last visited October 7, 2023).
[78] *Id.*

74.    Defendant knew their decisions and chosen course of conduct was risky and would cause consumers such as the Plaintiffs and the Class to be exposed to benzene. Defendant's conduct was not by accident, but was deliberate, calculated, and informed.  Defendant knew they could sell more BPO Products and earn more money by concealing material human health and safety information. Defendant further knew that testing the BPO Products for benzene would yield findings of benzene requiring recalls and/or a shutdown of production causing significant losses of income. Defendant's goals were met not only because of their false and deceptive advertising, labeling, and packaging, but through a comprehensive scheme of aggressive marketing and image branding leading consumers to believe they were acne treatment experts dedicated to drug research, development, and safety and using only the safest ingredients and formulations that would remain pure and stable until the designated end.  Defendant's conduct and concealment of material health information was done to further their own monetary gain and with conscious disregard of the Plaintiffs, the Class, and the public's right to choose safe products. Defendant's conduct was intentional, calculated, blatantly deceptive, unscrupulous, and offensive to consumer health and public policy.  To redress the harms caused by Defendant's conduct, Plaintiffs, on behalf of themselves and the Class, seek punitive damages against the Defendant.

## PLAINTIFF SPECIFIC ALLEGATIONS

75.    Plaintiff Efren Ramos is a California resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for his skin and face, Plaintiff Efren Ramos was particularly concerned about the product being cost effective and having fast results. Plaintiff recalls seeing Proactiv infomercials as a teenager, and as Proactiv became available in stores and online, he was more inclined to buy the Products without the subscription. Based on the statements made by Defendant, their widely recognized name, and lack of information that the Products had carcinogens such as benzene, Plaintiff believed the Products were safe to put on his skin. Defendant's representations and omissions of human health and safety information were material to Plaintiff.

76.    Plaintiff Ramos bought Proactiv Renewing Cleanser and used it from 2017 to February 2024 for his oily skin and breakouts. Plaintiff was unaware when he bought the Product that it was

1  contaminated with benzene or degraded to benzene. Had Defendant been truthful and told Plaintiff he
2  would be exposed to benzene and/or be at increased risk of cancer, he would not have bought Proactiv
3  Renewing Cleanser.

4      77.    Plaintiff Ramos suffered an ascertainable economic loss because of Defendant's
5  statements and misrepresentations because he bought the Product he would not have bought but for
6  Defendant's statements and misrepresentations.

7      78.    Plaintiff Joshua Cross is a California resident who places a high priority on health and
8  safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In
9  shopping for drug products for his skin and face, Plaintiff Joshua Cross was particularly concerned
10 about the product being safe and effective. Plaintiff recalls seeing advertisements on television by
11 Defendant before buying them in the store. Based on the statements made by Defendant, their widely
12 recognized name, and lack of information that the Products had carcinogens such as benzene, Plaintiff
13 believed the Products were safe to put on his skin. Defendant's representations and omissions of
14 human health and safety information were material to Plaintiff.

15     79.    Plaintiff Cross bought Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution
16 Renewing Cleanser, Proactiv+ Pore Targeting Treatment, and Proactiv Emergency Blemish Relief and
17 used it from January 2022 to December 2023. Plaintiff was unaware when he bought the Products that
18 it was contaminated with benzene or that it could degrade to benzene. Had Defendant been truthful
19 and told Plaintiff he would be exposed to benzene and/or be at increased risk of cancer, he would not
20 have bought Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution Renewing Cleanser, Proactiv+
21 Pore Targeting Treatment, and Proactiv Emergency Blemish Relief.

22     80.    Plaintiff Cross suffered an ascertainable economic loss because of Defendant's
23 statements and misrepresentations because he bought the Product he would not have bought but for
24 Defendant's statements and misrepresentations.

25     81.    Plaintiff Marisol Scharon is a California resident who places a high priority on health
26 and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In
27 shopping for drug products for her skin and face, Plaintiff Marisol Scharon was particularly concerned
28 about the safety and effectiveness to control the acne on her face. Plaintiff read the front labeling of

the product which encouraged her to buy the product by Defendant. Based on the statements made by Defendant, their widely recognized name, and lack of information that the Products had carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendant's representations and omissions of human health and safety information were material to Plaintiff.

82.     Plaintiff Scharon bought Proactiv Solution Repairing Treatment, Proactiv Renewing Cleanser, Proactiv+ Pore Targeting Treatment and Proactiv Emergency Blemish Relief and used it from August 2016 to March 2021 for the acne on her face. Plaintiff was unaware when she bought the Products that it was contaminated with benzene or that it could degrade to benzene. Had Defendant been truthful and told Plaintiff she would be exposed to benzene and/or be at increased risk of cancer, she would not have bought Proactiv Solution Repairing Treatment, Proactiv Renewing Cleanser, Proactiv+ Pore Targeting Treatment and Proactiv Emergency Blemish Relief.

83.     Plaintiff Scharon suffered an ascertainable economic loss because of Defendant's statements and misrepresentations because she bought the Product she would not have bought but for Defendant's statements and misrepresentations.

## CLASS ACTION ALLEGATIONS

84.     Plaintiffs bring this case on behalf of themselves, and all others similarly situated as a Class Action under CAL. CIV. CODE § 382. Plaintiffs seek to represent a California Class of consumers who bought Defendant's Products for use and not for resale. Excluded from this Class is Defendant, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and affiliated companies; Class counsel and their employees; and judicial officers and their immediate families as court staff assigned to the case.

85.     The Class does not seek damages for physical injuries, although each Plaintiff was physically harmed by being exposed to benzene.

86.     This action has been brought and may be properly maintained as a Class Action under CAL. CIV. CODE § 382 because there is a well-defined community of interest and the proposed Class meets the class action requirements of numerosity, commonality, typicality, and adequacy of representation.

87.     Defendant engaged in a common course of conduct giving rise to the legal rights sought

1    to be enforced by Plaintiffs, on behalf of themselves, and the other Class members. Similar or

2    identical statutory and common law violations, business practices, and injuries are involved.

3        88.    **Numerosity.**  Plaintiffs believe there are thousands of Class members making the Class

4    so numerous and geographically dispersed that joining all members is inconvenient and impracticable.

5        89.    **Commonality.**  There are questions of law and fact common to all Class members that

6    predominate over questions which affect only individual Class members.  All Class members were

7    deceived and misled by Defendant through the same advertising, online representations, labeling, and

8    packaging, which do not mention benzene and misrepresent the characteristics, ingredients, and safety

9    of the BPO Products.  All Class members bought Defendant's BPO Products and have suffered an

10    economic loss because of Defendant's deceptions and omissions. Thus, there is a well-defined

11    community of interest in the questions of law and facts common to all Class members.  Other

12    common questions of law and fact in this dispute include, without limitation:

13        a.    Whether Defendant's Products degrade to benzene under normal handling, use, and
14            storage conditions.

15        b.    Whether Defendant's tested the Products for benzene before selling them.

16        c.    When Defendant knew or should have known the Products degraded to benzene.

17        d.    Whether Defendant's advertising omitting benzene was deceptive, fraudulent, or unfair.

18        e.    Whether Defendant's advertising omitting benzene was likely to deceive reasonable
19            consumers.

20        f.    Whether Defendant's conduct violated California's Unfair Competition Law, Bus. &
21            Prof. Code § 17200 *et seq.*

22        g.    Whether Defendant's conduct violated California's False Advertising Law, Bus. & Prof.
23            Code § 17500 *et seq.*

24        h.    Whether Defendant's conduct violated California's Consumer Legal Remedies Act.

25        i.    Whether Defendant breached the express and implied warranties it made about the
26            Products.

27        j.    Whether Defendant was unjustly enriched by its misconduct.

28        k.    Whether the Plaintiffs and the proposed Class have been injured and if so, what is the

1    proper measure of damages.

2      l.   Whether the Plaintiffs and the proposed Class have the right to economic damages

3            including compensatory, exemplary, and statutory remedies for Defendant' misconduct.

4      m.   Whether the Plaintiffs and the proposed Class have the right to injunctive, declaratory, or

5            other equitable relief and attorneys' fees.

6    90.    **Typicality.**  The Plaintiffs' claims are typical of the claims of the Class because the

7  claims arise from the same course of misconduct by Defendant, *i.e.,* Defendant's false and misleading

8  advertising and their failure to disclosure benzene in the Products.  The Plaintiffs, and all Class

9  members were exposed to the same uniform and consistent advertising, labeling, and packaging

10 statements Defendant made about the Products. Because of the Defendant' misconduct, Plaintiffs, like

11 all Class members, were damaged and have incurred economic loss because of buying the Products

12 believed to be safe.  The claims of the Plaintiffs are typical of Class.

13   91.    **Adequacy.**   The Plaintiffs will fairly and adequately represent and protect the interests

14 of all Class members. Plaintiffs have no interests antagonistic to the Class members.  Plaintiffs hired

15 attorneys experienced in the prosecution of consumer Class Actions and Plaintiffs intend to prosecute

16 this action vigorously. Plaintiffs expect no difficulty in the management of this litigation as a Class

17 Action.

18   92.    Finally, this Class Action is proper under CAL. CIV. CODE § 382 because, under these

19 facts, a Class Action is superior to other methods and is the most efficient method for the fair and

20 efficient adjudication of the dispute. The Class members have all suffered economic damages because

21 of Defendant's deceptive trade practices, false advertising, and omissions of material health and safety

22 information. Because of the nature of the individual Class members' claims and the cost of the

23 Products, few, if any individuals, would seek legal redress against Defendant because the costs of

24 litigation would far exceed any potential economic recovery.  Without a Class Action, individuals will

25 continue to suffer economic losses for which they would have no remedy, and Defendant will unjustly

26 continue their misconduct with no accountability while keeping the profits of their ill-gotten gains.

27 Even if separate cases could be brought by individuals, the resulting multiplicity of lawsuits would

28 cause undue hardship, burden, and expense for the Court and the litigants, as well as create a risk of

1  inconsistent rulings across the country, which might be dispositive of the interests of individuals who

2  are not parties. A Class Action furthers the important public interest of containing legal expenses,

3  efficiently resolving many claims with common facts in a single forum simultaneously, and without

4  unnecessary duplication of effort and drain on critical judicial resources. The Class Action method

5  presents far fewer management difficulties than individual cases filed state wide and provides the

6  benefit of comprehensive supervision by a single court.

7  **CAUSES OF ACTION**

8  I.    **VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW Bus. & Prof. Code**

9  **§ 17200 *et seq.***

10      93.    Plaintiffs reallege and incorporate all other paragraphs in this Class Action Complaint

11  and further allege:

12      94.    Plaintiffs bring this cause of action on behalf of themselves, and all members of the

13  California Class, all of whom are similarly situated consumers.

14      95.    California's Unfair Competition Law,  Cal. Bus. & Prof. Code § 17200, *et seq.,*

15  prohibits "unlawful, unfair, or fraudulent business act or practices" and "unfair, deceptive, untrue or

16  misleading advertising."  Defendant misrepresented their Products in advertising, labels, and

17  containers and misled Plaintiffs and the Class about the ingredients, characteristics, purity, quality,

18  approval, and safety of the Products.  Defendant led Plaintiffs and the Class to believe the Products

19  were safe.

20      96.    Defendant's advertising, online representations, labeling, and packaging of the Products

21  were misleading, fraudulent, and deceptive. Defendant knew through the Products' development,

22  formulation, research, and pre-sale safety and stability testing, the Products were not chemically and

23  physically stable when exposed to common temperatures. Defendant knew or should have known the

24  Products formulated benzene under normal and expected consumer use, handling, and storage

25  conditions, and that consumers would be exposed to benzene. Defendant was specifically reminded by

26  the FDA of their obligation to ensure the safety and quality of their Products, including testing them

27  for benzene before selling them to the public, but shirked their duties and continued to market and sell

28  the Products without substantiating their safety, or warning Plaintiffs and the Class about benzene.

97.    Defendant omitted material health and safety information, *e.g.,* benzene, from the Products' advertising, label, container, and warnings.  Defendant did not tell Plaintiffs and the Class members they would be exposed to benzene, a human carcinogen, during normal and expected handling, use and storage of the Products, even with the Products' container closed.

98.    Defendant's acts and omissions were likely to deceive reasonable consumers and the public. Reasonable consumers expect to be told about all ingredients in Products. Reasonable consumers further expect that carcinogens in the Products be disclosed. Reasonable consumers further expect that on market drugs to be free of carcinogens, unless told otherwise.  Benzene is a widely marketed drug product used by children, teens, and the public is material health information reasonable consumers expect to be told.

99.    Had Defendant been truthful in their advertising, labeling, packaging, and online statements about benzene in the Products, or the risk of contamination, and the risk of cancer, Plaintiffs and the Class members would not have bought the Products.

100.    Defendant's acts, omissions, and concealment of material health and safety information are ongoing and continuing to cause harm. Defendant continues to market, advertise, and sell the Products to the public without telling the public about benzene in the Products, or the risk of contamination, and the risk of cancer.  Defendant continues to market themselves as responsible drug manufacturers and sellers who sell safe products when they have not tested the Products for benzene or measured the levels of benzene formed in the Products during normal and expected storage conditions.

101.    Defendant engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs and the Class members, and not outweighed by any benefit to Plaintiffs, the Class members, or the public.  Omitting and concealing material human health and safety information such as benzene in the Product and the consumers' risk of cancer from the Products is unethical, unscrupulous, and offensive.

102.    Plaintiffs suffered ascertainable economic losses because of Defendant's misconduct because they bought the Products they otherwise would not have bought but for Defendant's misrepresentations and affirmations of safety.

103.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves and the Class, seek recovery of their economic damages, attorneys' fees, restitution, and all other relief allowable under CAL. BUS. & PROF. CODE § 17200, *et seq.,* including an injunction to enjoin Defendant from continuing their fraudulent and deceptive business practices.  The damages sought are ascertainable, uniform to the Class and can be measured and returned to the Class members.

## II.    VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, CAL. CIV. CODE § 1750, *et seq.,*

104.    Plaintiffs reallege and incorporate all other paragraphs in this Complaint and further allege:

105.    Plaintiffs bring this cause of action on behalf of themselves, and all members of the California Class, all of whom are similarly situated consumers within the meaning of CAL. CIV. CODE § 1781.

106.    Defendant's acts and omissions violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.,* enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendant.

107.    California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.* prohibits unfair methods of competition and unfair or deceptive acts or practices in connection with the sale of consumer goods.  Defendant violated several prohibitions of CIV. CODE § 1750(a).

108.    Defendant violated CAL. CIV. CODE § 1750(a)(2) by representing the source, sponsorship, and approval, of the Products, *e.g.,* the Products were backed by sound scientific principles, that Defendant met its obligations to conduct adequate and meaningful quality and safety testing before selling the Products to the public, and represented the Products only had the ingredients listed, and were free of carcinogens.

109.    Defendant violated CAL. CIV. CODE § 1750(a)(3) by representing the affiliation, connection, or association with, or certification by, another *e.g.,* the Products were approved by dermatologists and made in conformity with current good manufacturing practices.

110.    Defendant violated CAL. CIV. CODE § 1750 (a)(4) by using deceptive representations, *e.g.,* the Products were safe, validated, and supported by the latest research, and free of carcinogens

1  such as benzene.

2      111.   Defendant violated CAL. CIV. CODE § 1750(a)(5) by representing the Products have

3  characteristics, ingredients, uses, or benefits, which they do not, *e.g.,* misleading Plaintiffs and the

4  Class members the Products only had the listed ingredients, did not have benzene, and did not

5  increase the risk of the consumers' risk of cancer.

6      112.   Defendant violated CAL. CIV. CODE § 1750(a)(6) by representing the Products were not

7  deteriorated unreasonably or altered *e.g.,* the Products were pure and had not degraded or formed

8  benzene.

9      113.   Defendant violated CAL. CIV. CODE § 1750(a)(7) by representing the Products were

10  pure and of a particular standard or quality, when they are not, and the Products were safe,

11  dermatologist approved, and not carcinogenic.

12      114.   Defendant violated CAL. CIV. CODE § 1750(a)(9) by advertising the Products with the

13  intent not to sell them as advertised*, e.g.,* the Products were of pure quality, safe, made in conformity

14  with current good manufacturing practices, and not adulterated.

15      115.   Had Defendant been truthful in their advertising, labeling, packaging, warnings, and

16  online statements about benzene in the Products and the risk of cancer, Plaintiffs and the Class

17  members would not have bought the Products. Benzene, a human carcinogen, in a widely marketed

18  and available consumer drug product, is material health and safety information Defendant knew

19  Plaintiffs, the Class members, and the public would want to know. The Defendant's omission of this

20  material information was common to all Class members and made to all Class members uniformly

21  through common advertising, online representations, labeling, and packaging.

22      116.   Defendant's acts, omissions, and concealment of material health and safety information

23  are ongoing and continuing to cause harm. Defendant continues to market, advertise, and sell the

24  Products to the public without telling the public about benzene in the Products and the risk of cancer.

25  Defendant continues to market themselves as responsible drug manufacturers and sellers who sell safe

26  products when they have not measured the levels of benzene in and created in the Products during

27  normal and expected storage conditions.

28      117.   Defendant engaged in these deceptive practices for significant financial gain, which is

1    unfair, unreasonably dangerous to Plaintiffs and the Class members, and not outweighed by any

2    benefit to Plaintiffs, the Class members, or the public.  Omitting and concealing material human

3    health and safety information such as the consumers' risk of cancer from exposure to the Products is

4    unethical, unscrupulous, and offensive.

5            118.    Plaintiffs suffered ascertainable economic losses because of Defendant's misconduct

6    because they bought the Products, they otherwise would not have but for Defendant's

7    misrepresentations.

8            119.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves and the Class

9    members, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution,

10   and all other relief allowable under CAL. CIV. CODE § 1750, *et seq.,* including an injunction to enjoin

11   Defendant from continuing their fraudulent business practices.  The damages sought are ascertainable,

12   uniform to the Class and can be measured and returned to the Class members.

13   **III.    VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW**

14           120.    Plaintiffs reallege and incorporate all other paragraphs in this Complaint and further

15   allege:

16           121.    Plaintiffs bring this cause of action on behalf of themselves, and all members of the

17   California Class, all of whom are similarly situated consumers.

18           122.    Defendant developed, researched, manufactured, tested, marketed, and sold the

19   Products throughout the United States. Defendant knew through the Products' development,

20   formulation, and testing, the Products were not chemically stable when exposed to certain expected

21   and normal environmental and storage conditions and can form benzene, as a toxic byproduct. Despite

22   this knowledge, Defendant did not mention benzene in the Products' advertising, ingredient list, label,

23   container, or warnings. Defendant did not tell Plaintiffs and the Class members they would be exposed

24   to benzene, a human carcinogen, during normal and expected handling, use and storage of the

25   Products, even with the Products' containers closed.

26           123.    Benzene, a human carcinogen, is a widely marketed and available consumer drug

27   product, is material health and safety information Defendant knew Plaintiffs, the Class members, and

28   the public would want to know.  Defendant not only omitted this material human health and safety

1  information from advertising, online representations, blogs, labeling, packaging, and warnings, but

2  Defendant aggressively marketed themselves as drug experts, innovators, researchers, market leaders,

3  and companies committed to consumer safety who devote substantial resources to drug research and

4  development.  Defendant's affirmations of safety and responsibility misled Plaintiffs, and the Class

5  members, leading them to believe the Products were tested, verified, and safe.  Defendant further

6  marketed the Products touting the approval of dermatologists, who were not aware of the presence of

7  benzene in the Products and of Defendant's refusal to conduct adequate and meaningful testing before

8  marketing and selling the Products to the public and following the FDA's 2022 alert to specifically

9  look for benzene.

10      124.    Defendant's acts and omissions constitute false advertising.  Defendant advertised the

11  Products with the intent not to sell them as advertised.  Reasonable consumers, including Plaintiffs

12  and the Class members, exposed to Defendant's advertising would believe the Products were safe,

13  verified, and free of benzene.

14      125.    Defendant's false and misleading advertising violated California's False Advertising

15  Law, Bus. & Prof. Code § 17500 *et seq.,* which prohibits Defendant from disseminating statements

16  "which are untrue or misleading, and which are known, or which by the exercise of reasonable care

17  should be known, to be untrue or misleading."  Defendant knew or should have known the Products

18  formed benzene under normal, handling, use, and storage conditions but did not disclose this to

19  Plaintiffs and the Class members.  Defendant knew through the Products' development, formulation,

20  research, and testing, the Products were not chemically stable when exposed to certain normal and

21  expected environmental conditions. Defendant knew Plaintiffs, the Class members, and consumers

22  would be exposed to benzene in the Products, even with the Products' original packaging closed.

23      126.    Had Defendant been truthful in their advertising, online representations, labeling, and

24  packaging about benzene, Plaintiffs and the Class members would not have bought the Products.

25      127.    Plaintiffs suffered ascertainable economic losses because of Defendant's misconduct

26  because they bought the Products, they otherwise would not have but for Defendant's material

27  misrepresentations.

28      128.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves and the

California Class, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendant from continuing their fraudulent business practices.  The damages sought are ascertainable, uniform to the Class and can be measured and returned to the Class members.

IV.    BREACH OF EXPRESS WARRANTY

129.    Plaintiffs reallege and incorporate all other paragraphs in this Complaint and further allege:

130.    Plaintiffs bring this cause of action on behalf of themselves, and all members of the California Class, all of whom are similarly situated consumers.

131.    The Uniform Commercial Code § 2-313 provides that an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the promise.  Defendant advertised and sold the Products as safe, pure, of good quality, and only containing the listed ingredients. Defendant's advertising, labels, containers, packaging, advertising, and online statements did not mention benzene, leading consumers to believe the Products were safe for their ordinary use. Defendant's affirmations were uniformly made to Plaintiffs and the Class members by Defendant in the Products' advertising, labeling, packaging, and online statements and were part of the basis of the bargain between Defendant, and the Plaintiffs and Class members.

132.    Defendant's affirmations and promises are unlawful. When Defendant marketed, distributed, and sold the Products, Defendant knew, or should have known, the Products degraded to benzene under normal and expected use, handling, and storage conditions.  Defendant knew, or should have known, the Products formed benzene and therefore did not conform to Defendant's express representations and warranties to consumers.  Plaintiffs and the Class members bought the Products in reasonable reliance on Defendant's statements.

133.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves and the California Class, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendant from continuing their fraudulent business practices.  The damages sought are ascertainable, uniform to the

1  Class and can be measured and returned to the Class members.

2  **V.    BREACH OF IMPLIED WARRANTY**

3         134.    Plaintiffs reallege and incorporate all other paragraphs in this Complaint and further

4  allege:

5         135.    Plaintiffs bring this cause of action on behalf of themselves, and all members of the

6  California Class, all of whom are similarly situated consumers.

7         136.    Defendant, as sellers of the Products, also made implied warranties including

8  warranting the Products were of the same quality and purity represented on the labels, in advertising,

9  and on Defendant's websites, were fit for the ordinary purpose of the Products and conformed to the

10 promises made on the containers, labels, advertising, and websites that all ingredients were listed, and

11 all warnings given.

12        137.    Defendant advertised their Products as safe, when they knew, or should have known,

13 the Products degraded to benzene. Defendant did not list benzene as an ingredient or contaminant

14 anywhere on the Products or advertising.  The Products are not of the quality and purity represented

15 by Defendant because the Products degrade to benzene under normal use, handling, and storage

16 conditions.

17        138.    Defendant did not tell Plaintiffs and the Class members the Products were not fit for

18 their ordinary use because the Products, as advertised and sold by Defendant, degraded to benzene

19 under normal and expected handling, use, and storage.

20        139.    Defendant's affirmations that the Products were safe for use were uniformly made to

21 the Plaintiffs and the Class members in the Products' advertising, labeling, and packaging, and on

22 Defendant's websites and social media sites, which were part of the basis of the bargain.

23        140.    Plaintiffs and the Class members bought the Products in reasonable reliance on

24 Defendant's statements, affirmations, and omissions of material health and safety information.

25        141.    Defendant's acts and omissions are ongoing and continuing to cause harm.

26        142.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, and the

27 California Class members, seek recovery of their actual damages, injunctive relief, attorneys' fees,

28 punitive damages, and all other relief allowable under the law.  The damages sought are uniform to

1  the Class and the actual damages can be measured and returned to the Class members who bought

2  Defendant's Products.

3  **VI.    UNJUST ENRICHMENT**

4      143.    Plaintiffs reallege and incorporate all other paragraphs in this Complaint and further

5  allege:

6      144.    Plaintiffs bring this cause of action on behalf of themselves, and all members of the

7  California Class, all of whom are similarly situated consumers.

8      145.    Defendant has unjustly profited from their deceptive business practices and kept the

9  profits from Plaintiffs and the Class members who bought the Products.

10     146.    Defendant requested and received a measurable economic benefit at the expense of

11  Plaintiffs and the Class members as payment for the Products.  Defendant accepted the economic

12  benefits from Plaintiffs and the Class members knowing the economic benefit received was based on

13  deception and omission of material human health and safety information.

14     147.    There is no utility in Defendant's misconduct and Defendant's enrichment from the

15  misconduct is unjust, inequitable, unconscionable, and against the strong public policy to protect

16  consumers against fraud.

17     148.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, and the

18  California Class, seek recovery of their actual damages, disgorgement of profits, injunctive relief,

19  attorneys' fees, punitive damages, and all other relief allowable under the law.  The damages sought

20  are uniform to the Class and the actual damages can be measured and returned to Class members who

21  bought Defendant's Products.

**PRAYER FOR RELIEF**

23     149.    WHEREFORE, Plaintiffs pray for judgment against Defendant:

24          a.    That the Court determine this action may be maintained as a Class Action under

25              CAL. CIV. CODE § 382;

26          b.    That Defendant's misconduct be adjudged to have violated the California

27              consumer protection laws identified;

28          c.    That Defendant's misconduct be adjudged to have violated its express and

1    implied warranties to Plaintiffs and the Class;

2         d.    That injunctive and declaratory relief be awarded against Defendant, including

3               but not limited to an order prohibiting Defendant from engaging in the alleged

4               misconduct;

5         e.    That Defendant be ordered to disgorge profits and revenues derived from their

6               course of misconduct and that such unjust enrichment be restored to the class

7               and or distributed cy pres as the Court shall consider just and equitable;

8         f.    That Plaintiffs recover all compensatory damages and other damages sustained

9               by Plaintiffs;

10        g.    That Plaintiffs recover punitive damages as allowed by law;

11        h.    That Plaintiffs recover all statutory damages as allowed by law;

12        i.    That Plaintiffs recover their attorneys' fees and all costs of suit;

13        j.    That Plaintiffs recover all statutory pre-judgment and post-judgment interest on

14              any amounts; and

15        k.    That all further relief as this Court may deem just and proper be granted.

16                              **DEMAND FOR JURY TRIAL**

17    150.   Demand is made for a jury trial.

18

19    Dated: March 7, 2024                        Respectfully Submitted,
                                                  **WISNER BAUM, LLP**
20

21                                                _____

22                                                Stephanie Sherman, Esq.
                                                  ssherman@wisnerbaum.com
23                                                R. Brent Wisner, Esq.
                                                  rbwisner@wisnerbaum.com
24                                                11111 Santa Monica Boulevard, Suite 1750
                                                  Los Angeles, CA 90025
25                                                Telephone: (310) 207-3233
                                                  Facsimile: (310) 820-7444
26

27                                                *Counsel for Plaintiffs*

28